IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DENNIS T. SWANBERG,

            Plaintiff,

    v.

CITY OF CANBY, an Oregon municipal
corporation; JORGE TRO, an individual;
BRET SMITH, an individual,

            Defendants.

No. 3:14-cv-00882-HZ

OPINION & ORDER

Matthew C. Ellis
Law Office of Matthew C. Ellis
621 SW Morrison St., Ste. 1050
Portland, OR 97205

//

OPINION & ORDER - 1

Stephen L. Brischetto
Attorney at Law
621 SW Morrison St., Ste. 1025
Portland, OR 97205

     Attorneys for Plaintiff


Alyssa R. Engelberg
Richard R. Meneghello
Fisher & Phillips, LLP
111 SW Fifth Ave., Ste. 4040
Portland, OR 97204

Blake H. Fry
Karen M. Vickers
Mersereau & Shannon, LLP
One SW Columbia St., Ste. 1600
Portland, OR 97258

     Attorneys for Defendants


HERNÁNDEZ, District Judge:

     Plaintiff Dennis Swanberg worked as a police officer for the City of Canby, Oregon for almost thirty years. In 2012, he resigned amidst an internal investigation during which his supervisors alleged he lied about his handling of a citizen encounter. Swanberg claims the investigation was pretextual and driven by his supervisors' resentment of his past involvement in legal actions which alleged gender discrimination and criminal corruption within the Canby Police Department.

     Swanberg filed suit in this Court, alleging that the City of Canby and individual defendants Jorge Tro and Bret Smith (collectively "Defendants") retaliated against him for exercising his constitutional right to free speech and right to petition the government, and violated his right to equal protection of the law. Currently before the Court is Defendants' motion for summary judgment on all claims. Because Swanberg has raised a question of fact

about the motivations behind the internal investigation into his conduct, Defendants' motion for summary judgment against Swanberg's First Amendment claims is denied. Defendants' motion against Swanberg's equal protection claim is granted because Swanberg has failed to produce evidence that Defendants' actions were in retaliation for his association with a member of a protected class.

BACKGROUND

Swanberg began working for the Canby Police Department ("CPD") in September of 1984. Plaintiff's Memo in Opposition to Defendants' Motion for Summary Judgment ("Pl. Memo."), ECF No. 42, at 1. The events relevant to the present suit did not begin until 2009, when Swanberg initiated a civil rights lawsuit against the City of Canby alleging that then-Chief of Police Greg Kroeplin retaliated against him after Swanberg investigated a drug house that appeared to implicate another officer and close friend of Kroeplin. Ellis Declaration ("Decl.") Exhibit ("Ex.") 1, ECF No. 43-1, at 2. A federal investigation later discovered the officer bought drugs on duty, and there was evidence Kroeplin helped cover up the misconduct. Pl. Memo. at 1. Part of Swanberg's lawsuit alleged that Defendant Jorge Tro, who was acting Chief of Police at the time Swanberg filed suit, promised Swanberg that, if he took a voluntary demotion to officer for a year, he would be reinstated to his former position as Sergeant and head of the detective unit after Kroeplin left the department. Id. at 1; Ellis Decl. Ex. 1 at 2. Swanberg withdrew his lawsuit in 2010 before any ruling on the merits and without being reinstated. Defendants' Motion for Summary Judgment ("Def. Mot.") at 16.

A few months later, Swanberg was involved in another investigation into the Canby Police Department after fellow officer Teresa Britton filed a gender discrimination complaint with the Bureau of Labor and Industries ("BOLI"). Ellis Decl. Ex. 8, ECF No. 43-8, at 1. Swanberg told BOLI investigators that Britton was a good employee, that former Chief Kroeplin

"had a problem with females in law enforcement," and that he heard Kroeplin remark that he "wanted to get rid of females." Id. at 4. Another officer, Nathan DiCenzo provided similar evidence in support of Britton's gender discrimination claim. Id. at 3–4; Ex. 16. BOLI eventually found there was "substantial evidence of an unlawful employment practice . . . on the basis of gender/sex[.]" Ellis Decl. Ex. 8 at 8 (caps omitted). Britton subsequently left the CPD and filed a suit claiming she was constructively discharged in retaliation for her BOLI complaint. Ellis Decl. Ex. 15, ECF No. 43-15. DiCenzo too left the CPD and submitted a tort claim notice to City of Canby alleging he was constructively discharged for his whistleblowing activities. Ellis Decl. Ex. 16, ECF No. 43-16. Neither of the suits were adjudicated on the merits. Def. Reply at 16.

On March 7, 2012, a few weeks before incident and investigation that led to Swanberg's resignation, he participated in a training program regarding "Karly's Law," an Oregon state statute that requires law enforcement personnel to take certain actions when encountering a situation involving possible child abuse. Swanberg Deposition ("Depo."), ECF No. 40-1, at 12–13. The law requires an officer who "observes a child who has suffered suspicious physical injury" that may have been the result of "abuse" to, among others, take photographs and write a report of an incident. ORS § 419B.020–023. The statute defines "suspicious injury" as including "[b]ruising, swelling or abrasions on the head, neck or face" and defines "abuse" as including "[a]ny assault . . . of a child and any physical injury to a child which has been caused by other than accidental means[.]" ORS 419B.005(1)(a); 419.023(1)(b). As part of the training, Swanberg received a laminated card summarizing Karly's Law and what he was supposed to do if he encountered a child abuse situation. Swanberg Depo., ECF No. 40-1, at 13. CPD management followed up with all officers through an email after the training further emphasizing the law and the officer's obligations under it. Id. at 13–14.

OPINION & ORDER - 4

On March 27, 2012, approximately three weeks after attending the Karly's Law training, Swanberg and cover officer Greg Larrison responded to a domestic disturbance call made by a fourteen-year-old girl who alleged that her twenty-six year old step sister slapped and choked her. Meneghello Decl. Ex. 4, ECF No. 40-4, at 1. When the officers arrived on the scene, it was apparent that the minor had suffered an injury on her face, below her eye. Swanberg Depo., ECF No. 40-1, at 15. Despite the child's facial injury, and the reports from the minor that she and the stepsister had engaged in a physical altercation, Swanberg did not take any pictures of the injury, and did not complete a report of the incident. Id. at 15. Swanberg testified that he believed the injury was superficial, not suspicious, and thus, did not trigger the required procedures under Karly's Law. Id. at 15–16.

About a week later, on April 4, 2012, duty Sergeant Kitzmiller received a call from Marcus Fant, a juvenile probation officer assigned to the fourteen-year-old, inquiring about the March 27 incident and why the responding officers did not write a report. Meneghello Decl. Ex. 2, ECF No. 40-2, at 4–5; Ellis Decl. Ex. 6, ECF No. 43-6, at 6. Sgt. Kitzmiller informed Lieutenant ("Lt.") Tro of the call, and they spoke with Chief Smith regarding the incident and Fant's complaint about the lack of a written report. Tro Depo., ECF No. 43-6, at 12–14. Detective Chris Mead was eventually assigned to re-investigate the incident; he interviewed the individuals involved and several witnesses, and generated a written report on April 9, 2012. Smith Depo., ECF No. 43-7, at 35–37; Meneghello Decl. Ex. 7, ECF No. 40-7, at 1. Chief Smith reviewed Mead's report, determined that the incident likely implicated Karly's Law, and initiated an internal investigation, to be led by Lt. Tro, into whether Swanberg and Larrison had mishandled the incident. Tro Depo, ECF No. 40-8, at 2; Smith Depo., ECF No. 43-7, at 27–31. Smith, Tro, and Kitzmiller discussed whether to inform Swanberg about the complaint and their

investigation, but Smith instructed them that the investigation into Swanberg "was to be confidential." Smith Depo., ECF 43-7, at 38.

Tro reviewed the file, and interviewed Mr. Fant and another witness outside of the CPD, though he did not record those conversations and he destroyed his notes of the interviews. Tro Depo., ECF No. 43-6, at 22–25. Tro then met with Swanberg on April 25, 2012 for the first of two interviews. Ellis Decl. Ex. 11, ECF No. 43-11. Tro concluded that Swanberg's handling of the March 27 encounter violated four separate laws and regulations. Meneghello Decl. Ex. 9, ECF No. 40-9, at 9–16.  After the interview, Tro spoke with the witnesses again, and interviewed Swanberg a second time on May 22, 2012. Tro Depo., ECF No. 43-6, at 34–36; Def. Mot. at 8. In a follow up memo to Chief Smith dated June 1, 2012, Tro concluded that Swanberg had been dishonest during the two interviews, and suggested that the matter be referred to an independent fact-finder. Meneghello Decl. Ex. 10, ECF No. 40-10, at 5–6. Chief Smith agreed, and referred the matter to Chief Paul Rubenstein of the Cornelius Police Department, who sustained Tro's findings. Meneghello Decl. Ex. 12, ECF 40-12, at 1, 5–7.

On June 6, 2012, Chief Smith issued to Swanberg a fourteen-page Notice of Proposed Discipline that detailed eleven policy violations and recommended that Swanberg be terminated from the CPD. Meneghello Decl. Ex. 13, ECF No. 40-13 at 13–15. After a mitigation hearing a few days later, Swanberg voluntarily resigned his employment through a written letter of retirement on June 18, 2012. Meneghello Decl. Ex. 16, ECF No. 40-16. As required by law, Chief Smith notified the Oregon Department of Public Safety Standard and Training ("DPSST")[1] that Swanberg had retired while under investigation. Id. A DPSST committee reviewed Swanberg's file and recommended his police certification be revoked. Meneghello Decl. Ex. 18,

---

[1] DPSST is the State of Oregon agency charged with training and certifying police, fire, corrections, parole, and probations personnel. State of Oregon, Department of Public Safety Standards and Training, OREGON.GOV, http://www.oregon.gov/DPSST/Pages/index.aspx (last visited Aug. 15, 2015).

ECF No. 40-18, at 5. A majority of the DPSST Board of Policy Standards and Training voted to "go forward with the revocation as recommended." Meneghello Decl. Ex. 20, ECF 40-20, at 4.

On November 20, 2012, DPSST issued a Notice of Intent to Revoke Swanberg's certification, and Swanberg requested a hearing before an Administrative Law Judge ("ALJ") to determine whether that decision was proper. Meneghello Decl. Ex. 21, ECF 40-21, at 1. ALJ Rick Barber held a hearing in September of 2013 at which Mr. Fant, Officer Larrison, Lt. Tro, and others testified. ALJ Barber ultimately found that "Swanberg's investigation of the March 27 incident was insufficient" but that DPSST "failed to show that Swanberg was dishonest during CPD's followup investigation." Id. at 18.

Swanberg subsequently filed suit in this court against the City of Canby, and individual defendants Chief Smith and Lt. Tro, alleging that his resignation was a constructive discharge driven by Defendants' desire to retaliate against him for filing a lawsuit against the City and for supporting Officer Britton's BOLI complaint. Defendants claim their decision to terminate Swanberg was justified by his failure to comply with Karly's law and for being dishonest during the internal investigation into his conduct, and now ask the court for summary judgment.

STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

OPINION & ORDER - 7

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d

1108, 1112 (9th Cir. 2011).

DISCUSSION

Swanberg brings three claims. He alleges in two separate counts that the City of Canby,

Chief Smith, and Lt. Tro violated his First Amendment rights of free speech and petition by

retaliating against him for his past involvement in civil actions against the City and the CPD.

Swanberg also claims that Defendants specifically retaliated against him because of his support

of a former co-worker's gender discrimination claim, thus violating Swanberg's Equal Protection

rights.

**I.      First Amendment Claims**

Swanberg asserts that the Defendants violated his First Amendment right to petition the

government and right to free speech by initiating a retaliatory internal investigation into his

handling of the March 27 citizen encounter and forcing him to resign from the CPD. Courts

analyze claims alleging First Amendment retaliation against a public employer using a five-part

test:

(1) whether the plaintiff spoke on a matter of public concern;

(2) whether the plaintiff spoke as a private citizen or public employee;

(3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action;

(4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and

(5) whether the state would have taken the adverse employment action even absent the protected speech.

Eng v. Cooley, 552 F.3d 1062, 1070–72 (9th Cir. 2009).[2] The plaintiff bears the burden at steps one through three; the defendant bears the burden for steps four and five. Id. A finding against the plaintiff at any of the steps is necessarily fatal to the plaintiff's claims. Dahlia v. Rodriguez, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (citing Desrochers v. City of San Bernadino, 572 F.3d 703, 709–19 (9th Cir. 2009)). Defendants concede, for the purposes of summary judgment, that there are issues of fact as to the first two parts of the test. Def. Mot. at 18. The key questions, therefore, are whether Swanberg carried his burden to show causation at step three, and whether Defendants can establish one of the two defenses at steps four or five.

### a.  Substantial Motivating Factor

At the third step, the plaintiff bears the burden of proving that his protected speech was a "substantial or motivating" factor in the defendant's adverse employment action against him. Shepard v. City of Portland, 829 F. Supp. 2d 940, 967 (D. Or. 2011) (citing Eng, 552 F.3d at 1071). "As with proof of motive in other contexts, this element of a First Amendment retaliation suit may be met with either direct or circumstantial evidence, and involves questions of fact that normally should be left for trial." Ulrich v. City of San Francisco, 308 F.3d 968, 979 (9th Cir.

---

[2] While the Free Speech and Petition clauses address different types of expression, the right to speak and the right to petition are said to be "cognate rights" that courts often analyze using similar tests. Borough of Duryea, Pa. v. Guarnieri, 131 S. Ct. 2488, 2494–95 (2011) (applying the Free Speech "public concern" framework to claim brought under Petition Clause by former police chief against municipality for retaliation). Neither party disputes that Swanberg's petition claim and speech claim are essentially one-in-the-same and subject to five-factor test set out in Eng. 552 F.3d at 1070–72.

2002) (citing <u>Allen v. Iranon</u>, 283 F.3d 1070, 1074 (9th Cir. 2002); <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999)).

    Direct evidence is "evidence, which, if believed, proves discriminatory animus without inference or presumption." <u>Dominguez-Curry v. Nevada Transp. Dept.</u>, 424 F.3d 1027, 1038 (9th Cir. 2005) (citing <u>Godwin v. Hunt Wesson, Inc.</u>, 150 F.3d 1217, 1221 (9th Cir. 1998)). Direct evidence typically consists of "clearly sexist, racist, or similarly discriminatory statements or actions by the employer." <u>Id.</u> (quoting <u>Coghlan v. Am. Seafoods Co.</u>, 413 F.3d 1090, 1095 (9th Cir. 2005)). "Generally, a plaintiff need only offer very little direct evidence of motivation to survive summary judgment on this element." <u>Ulrich</u>, 308 F.3d at 980 (citing <u>Winarto v. Toshiba Am. Elec. Components, Inc.</u>, 274 F.3d 1276, 1284 (9th Cir. 2001)) (additional citations omitted). Even "a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer." <u>Dominguez-Curry</u>, 424 F.3d at 1039 (citing <u>Chuang v. Univ. of California Davis, Bd. of Trustees</u>, 225 F.3d 1115, 1128 (9th Cir. 2000) (holding that a decisionmaker's remark that " 'two Chinks in the pharmacology department were 'more than enough' " was "an egregious and bigoted insult . . . that constitutes strong evidence of discriminatory animus on the basis of national origin")) (additional citation omitted).

    Swanberg offers as direct evidence of retaliation testimony from Lt. Tro that he harbored "hurt feelings" toward Swanberg stemming from Swanberg's 2009 lawsuit against the City of Canby. Tro testified that his and Swanberg's relationship "changed a little bit" after the lawsuit because

>  [Swanberg] . . . filed a lawsuit against us, and one of the things in that lawsuit, he said that I had promised him a sergeant position if I'd become chief, and that was not the case. And so it was a little different relationship because he said that I said something that I didn't, but we still had a working relationship.

Ellis Decl. Ex. 10, ECF No. 43-10, at 3. Tro later expanded on his reaction to Swanberg's suit:

> Q: You mentioned to you – on account of the allegations that Officer Swanberg brought in his federal lawsuit that you had bad feelings at the time and that you still have bad feelings about those allegations, right?
>
> A: It – it – I mean, it hurts my feelings when someone says that – they call you that – call you basically a liar. So yes.
> . . .
> Q: And you had bad feelings about that as of March 26, 2012?
>
> A: I didn't have bad feelings; I had hurt feelings, because I did consider him a friend and a co-worker.

Id. at 4–5.

Swanberg argues that Tro's "angry reaction" to his lawsuit is direct evidence of retaliation. Pl. Memo. at 10 (citing Walker v. Brand Energy Services, LLC, 726 F. Supp. 2d 1091, 1102 (E. D. Cal. 2010)). But Tro's after-the-fact testimony about his state of mind is not the same kind of "direct evidence" at issue in Walker and the cases that court relied on to deny the employer's motion for summary judgment. 726 F. Supp. 2d at 1102–03 (finding direct evidence of retaliation from witness testimony that supervisor was visibly "angry at what [the plaintiff] said and . . . indicated that getting rid of [the plaintiff] was retaliation" for his protected speech) (citing Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 736, (1983) (direct evidence of retaliatory purpose includes threats to "get even with" and "hurt" individual)).

The fact-finder must make a leap, however small, from Tro's involvement in the internal investigation into Swanberg, and his later testimony about his attitude toward Swanberg at the time of the investigation. Thus, his testimony is not direct evidence of retaliation. Dominguez-Curry, 424 F.3d at 1038 (direct evidence is "evidence, which, if believed, proves discriminatory animus without inference or presumption.").

OPINION & ORDER - 11

That conclusion, however, is of little practical significance because Swanberg has produced circumstantial evidence from which a reasonable juror could conclude that the internal investigation was driven by a retaliatory motive and was merely a pretext for removing him from the CPD. Where the employer knew of the protected speech or conduct, circumstantial evidence sufficient to raise an issue of fact on the question of retaliatory motive falls into three, nonexclusive categories: "(1) proximity in time between the protected speech and the alleged retaliation; (2) the employer's expressed opposition to the speech; and (3) other evidence that the reasons proffered by the employer for the adverse employment action were false and pretextual." Ulrich, 308 F.3d at 981 (citing Allen, 283 F.3d at 1077). A plaintiff can "show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable." Dominguez-Curry, 424 F.3d at 1037 (citing, 150 F.3d at 1220–22). In contrast to the minimal direct evidence of improper motive that is sufficient to survive summary judgment, circumstantial evidence must be "specific and substantial." Dominguez-Curry, 424 F.3d at 1038.

Although it may not be direct evidence of retaliation, Tro's testimony that he harbored hurt feelings toward Swanberg and about Swanberg's prior lawsuit at the time he conducted the internal investigation into Swanberg's conduct could lead a reasonable juror to find retaliatory animus. Dominguez-Curry, 424 F.3d at 1038 ("Where, as here, the person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision.") (citing Mondero v. Salt River Project, 400 F.3d 1207, 1213 (9th Cir.2005)).

Swanberg also produced evidence of irregularities in the internal investigation that could suggest Defendants were driven by a retaliatory motive. Even though Swanberg and Larrison were both at the scene of the March 27 citizen encounter, and both were off of work on the day the complaint came in, Sgt. Kitzmiller called Larrison, but not Swanberg, to inquire about what happened. Tro Depo., ECF No. 43-6, at 13, 48–49; Smith Depo., ECF No. 43-7, at 216. Chief Smith decided to launch an investigation into Swanberg's handling of the incident and the lack of a written report. However, Officer Larrison testified that when his supervisors at the CPD have asked him about a missing report for a situation which warranted one, it was sufficient for him to simply write a report after the fact or, more often, have another officer assist with a follow-up. Ellis Decl. Ex. 13, ECF No. 43-10, at 2–3. Finally, at each of the two interviews Tro conducted of Swanberg, Tro told Swanberg that he had been provided with "all of the information necessary to be reasonably appraised of the nature of the allegations of the complaint," and that Swanberg was "provided a copy of relevant police reports, summary of allegations, and a copy of the original complaint." Ellis Decl. Ex. 11, ECF No. 43-11, at 1; Ellis Decl. Ex. 12, ECF No. 43-12, at 1. But Tro withheld the complaint from Mr. Fant which precipitated the investigation and reports from Mead and another witness about the incident. Smith Depo., ECF No. 43-7, at 50–60. Swanberg also testified that people within the CPD, including Lt. Tro and other managment, used the term "Three Amigos" to describe Swanberg, DiCenzo, and Britton. Swanberg Depo., ECF No. 43-5 at 61–62. Chief Smith testified that the term was connected with litigation activity and could, depending on the context, be seen as derogatory. Smith Depo., ECF No. 43-7, at 14–17. Combined with evidence of Tro's "hurt feelings" toward Swanberg at the time of the investigation, a reasonable fact-finder could rely on these facts to find that Swanberg's lawsuit and support of Britton's BOLI complaint was a

substantial motivating factor in Defendants' decision to investigate his handling of the March 27 incident and to recommend his termination.

### b. Adequate Justification

Having found that Swanberg met his burden at step three, the burden now shifts to Defendants at steps four and five of the Eng test. At the fourth step, Defendants must show that "under the balancing test established by Pickering, the state's legitimate administrative interests outweigh the employee's First Amendment rights." Eng, 552 F.3d at 1071 (quoting Thomas v. City of Beaverton, 379 F.3d 802, 808 (9th Cir. 2004) (alterations omitted). This so-called "Pickering balancing test" asks "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the public." Id. (quoting Garcetti, 547 U.S. at 418). A legitimate government interest can include "promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service." Clairmont, 632 F.3d at 1106 (citation omitted). This analysis is an attempt to balance the government's administrative interest as an employer against the plaintiff's right to speak, and depends on the degree of "disruption resulting from both the act of speaking and from the content of the speech." Id. at 1107. This inquiry is ultimately a legal question, although its resolution may implicate underlying factual disputes. Eng, 552 F.3d at 1071. Given the procedural posture of this case, the Court must construe any disputed facts in the light most favorable to Swanberg.

Defendants contend they had "ample justification for opening the investigation" into Swanberg's handling of the March 27th incident. But that argument misses the mark for the Pickering analysis. Instead, the question is whether Swanberg's interest in expressing himself through his lawsuit in 2009 and participation in Britton's 2010 BOLI complaint is outweighed by

OPINION & ORDER - 14

the CPD's interest in avoiding the disruptive effects of Swanberg's conduct. See Hufford v.

McEnaney, 249 F.3d 1142, 1144–49 (9th Cir. 2001); Moran v. State of Wash., 147 F.3d 839, 848

(9th Cir. 1998) ("the *very point* of the Pickering balancing test is to weigh the value of the speech

that causes the disruption against the harm of the disruption that is caused, either directly or

indirectly, by the speech."). The Ninth Circuit in Bauer v. Sampson listed five factors for use in

the Pickering balancing analysis, including:

(1)  whether the employee's speech disrupted harmony among co-workers;
(2)  whether the relationship between the employee and the employer was a close
     working relationship with frequent contact which required trust and respect
     in order to be successful;
(3)  whether the employee's speech interfered with performance of his duties;
(4)  whether the employee's speech was directed to the public or the media or to a
     governmental colleague; and
(5)  whether the employee's statements were ultimately determined to be false.

261 F.3d 775, 785 (9th Cir. 2001) amended, (9th Cir. Oct. 15, 2001).

Defendants' argument does not address this Pickering analysis, and thus the Court finds

that Defendants have not carried their burden on this point. In fact, the evidence in the record

suggests that Swanberg's protected conduct produced little, if any, disruption at the CPD. Smith

testified that the deposing of CPD employees in connection with a lawsuit "could [affect] to

some degree" the manner in which he ran the department, but that he was not concerned at all

that Swanberg's conduct could lead to retaliation or a disintegration of working relationship

within the CPD. Smith Depo., ECF No. 43-7 at 14–15.

Moreover, Swanberg has produced enough evidence for a reasonable factfinder to

conclude that CPD's internal investigation into the March 27 incident was simply a pretext to

remove Swanberg from the force. Defendants cannot now rely on that investigation as evidence

of a legally sufficient justification for limiting Swanberg's speech. Robinson v. York, 566 F.3d

817, 825 (9th Cir. 2009) ("Although we have sometimes found a police department's interests in

discipline and *esprit de corps* to outweigh First Amendment interests, genuine factual disputes here—including . . . whether the justifications Defendants assert for their actions were pretextual—preclude such a determination at this stage of the litigation.") (citations omitted).

### c.  Same Decision Without Retaliation

If the defendant fails the Pickering balancing test, it can still avoid liability if it can show that it "would have reached the same adverse employment decision even in the absence of the employee's protected conduct." Eng, 552 F.3d at 1072 (citing Thomas, 379 F.3d at 808). "In other words, it may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action." Id. (citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

This so-called "Mt Healthy mixed-motive inquiry is an intensely factual one." Gilbrook v. City of Westminster, 177 F.3d 839, 855 (9th Cir. 1999). The defendant bears the burden of proof and "must vault a very high hurdle to obtain judgment as a matter of law." Metoyer v. Chassman, 504 F.3d 919, 940 (9th Cir. 2007) (citing Settlegoode v. Portland Public Schools, 371 F.3d 503, 512 (9th Cir. 2004). "Accordingly, mixed-motive defenses are generally for the jury to decide." Id. at 940.

Defendants do not cite specifically to any evidence in the record. Instead, they repeat that the evidence "demonstrate[s] that their actions were justified and that they would have proceeded as they did regardless of whether Plaintiff had taken his protected actions years earlier." Def. Mot. at 25. Defendants also assert that they met their burden by showing that the investigation into Swanberg's handling of the March 27th incident was driven by a third party complaint. Def. Reply at 11.

But that does not change the Court's conclusion that Swanberg has produced sufficient evidence which suggests that the investigation itself could have been driven by a retaliatory motive. A reasonable juror could find that third party complaint provided Tro, Chief Smith, and others in CPD management the opportunity to push Swanberg out the door. Defendants cannot rely on a potentially pretextual investigation to show that Swanberg's allegedly insufficient handling of the March 27 incident would have inevitably led to the decision to terminate him. See Eng, 552 F.3d at 1074 (rejecting the defendant's 'but-for' causation argument that employee's suspensions were based on "information gathered from three separate internal investigations" because it "ignore[d]" the plaintiff's "allegations that the investigations . . . were *themselves* motivated by his exercise of his First Amendment rights.").

### 2. Qualified Immunity

Defendants Smith and Tro assert they are entitled to qualified immunity as a defense from Swanberg's claims. Def. Mot. at 26–28. "Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Chappell v. Mandeville, 706 F.3d 1052, 1056 (9th Cir. 2013) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Analysis of a qualified immunity defense requires the court to determine whether, taking the facts in the light most favorable to the party asserting injury, the alleged conduct violated a constitutional right and whether the right was clearly established at the time of the alleged violation. Ashcroft v. Al–Kidd, 131 S.Ct. 2074, 2080 (2011).

A right is clearly established if its "contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (explaining that "in light of the pre-existing law the unlawfulness must be apparent"). There is no requirement for a "case directly on point, but existing precedent must

have placed the statutory or constitutional question beyond debate." Ashcroft, 131 S.Ct. at 2083.

Whether a right is clearly established for the purposes of qualified immunity "depends

substantially upon the level of generality at which the relevant 'legal rule' is to be identified."

Ford v. City of Yakima, 706 F.3d 1188, 1195 (9th Cir. 2013) (quoting Anderson, 483 U.S. at

639. "The right must not be stated as a broad general proposition, but rather must be defined with

enough specificity to put a reasonable officer on notice that his conduct is unlawful." Id. (citing

Reichle v. Howards, 132 S.Ct. 2088, 2093–94 (2012); but see Fogel v. Collins, 531 F.3d 824,

833 (9th Cir. 2008) ("The matching of fact patterns demands only a level of particularity such

'that a reasonable official would understand that what he is doing violates th[e] right.' "

Defendants argue that a reasonable officer "would have no reason to believe that

terminating a police officer for eleven separate policy violations years after he made certain

alleged 'reports' would violate the First Amendment." Def. Mot. at 27. They point out that "at

the DPSST committee level, between seventeen and twenty-six other law enforcement

representatives reviewed the case and believed that Plaintiff's actions were so egregious that his

license should be revoked[.]" Def. Mot. at 28. Furthermore, an "independent reviewer of the

matter—Chief Rubenstein of the Cornelius Police Department—agreed with Lt. Tro's

investigatory conclusions before Chief Smith issued the Notice of Proposed Discipline." Id. at

28.

Defendants do not dispute that Swanberg engaged in protected conduct; they instead

argue that Swanberg's firing was not caused by his protected speech, but by the March 27

incident and his conduct during the subsequent internal investigation. As explained above,

Swanberg has produced evidence sufficient for a reasonable fact-finder to conclude that the

investigation itself was driven by a retaliatory motive. If a jury determines that Swanberg's

version of the facts is true, Smith and Tro will not be entitled to qualified immunity, because a reasonable government official would have recognized that Swanberg's speech and conduct were protected, and that taking an adverse employment action against him in retaliation for that protected expression is illegal. There is no question that "the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established" decades before the relevant acts in this case. Coszalter v. City of Salem, 320 F.3d 968, 979 (9th Cir. 2003) (citing Supreme Court and Ninth Circuit cases dating back to the 1960s). Therefore, the Court cannot at this stage conclude that Tro and Smith are entitled to the defense as a matter of law. Id. at 978–79 (rejecting qualified immunity in First Amendment retaliation case where plaintiff had produced sufficient evidence for a reasonable fact-finder to conclude that "defendants' proffered explanation for one of the three adverse employment actions was pretextual.")

Defendants counter that Chief Smith and Lt. Tro are still entitled to qualified immunity because they did not act "objectively unreasonably in determining that their actions were constitutional." Def. Reply at 14–15 (citing Hunt v. Cnty. of Orange, 672 F.3d 606, 615–16 (9th Cir. 2012), for the proposition that where officials "could have reasonably but mistakenly believed that their conduct did not violate a clearly established constitutional right, they are entitled to qualified immunity.") (brackets omitted). They again point to the fact that "between seventeen and twenty-eight other law enforcement officials reviewed the case and determined that [Swanberg's] conduct was egregious enough to warrant the revocation of his license." Id.

The question in this case is not whether the Defendants have articulated a sufficient reason for firing Swanberg, but whether the internal investigation into his conduct was driven by an illegal retaliatory motive. See Coszalter, 320 F.3d at 979 (question of qualified immunity did

OPINION & ORDER - 19

not depend on facts surrounding employer's proffered justification for termination, but whether "both the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established."). If all a defendant had to do to avoid liability for employment discrimination was state a justifiable reason for an adverse employment action, the Court would not have to inquire about whether a defendant's stated justification is a pretext for otherwise illegal conduct. Defendants' argument essentially asks the Court to short-circuit the Eng analysis and conclude as a matter of law that Tro's internal investigation was not pretextual.

Finally, Defendants argue that "because the Pickering balancing test is a context-intensive, case-by-case balancing analysis, the outcome of which is rarely clear[,] . . . the law regarding First Amendment retaliation claims will rarely, if ever be sufficiently clearly established to preclude qualified immunity." Def. Mot. at 28 (quoting Eng, 552 F.3d at 1076 n.6). But this is that "rare" clear case. See Moran v. State of Wash., 147 F.3d 839, 850 (9th Cir. 1998) (explaining that the Pickering balancing test is not always so difficult to resolve). The Pickering analysis in this case is incontestable: the First Amendment protects a public employee's right to participate in whistleblower activities, and it has for decades been illegal for a government employer to "condition public employment on a basis that infringes the employee's constitutional protected interest in freedom of expression." Connick v. Myers, 461 U.S. 138, 142 (1983) (citing Keyishian v. Board of Regents, 385 U.S. 589, 605–06 (1967) (additional citations omitted)). Chief Smith testified, there was little, if any, disruption within the department from Swanberg's protected activities. Smith Depo, ECF No. 43-7 at 14–15. If Swanberg's version of the facts is true, no reasonable government official could have believed it lawful to undertake a pretextual internal investigation to quash protected speech that was not

OPINION & ORDER - 20

otherwise hindering the department's operations. Defendants' argument for qualified immunity is rejected.

### 3. Municipal Liability

Defendants argue that Swanberg's claims against the City of Canby should be dismissed because he has not produced sufficient evidence that the alleged constitutional violations were caused by a City policy or custom. A municipality may be held liable as a "person" under Section 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91 (1978). However, "a municipality cannot be held liable solely because it employs a tortfeasor or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." Id. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694; see also Gillette v. Delmore, 979 F.2d 1342, 1347 (9th Cir.1992) ("[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability") (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988)).

There are three ways to establish municipal liability: (1) "[s]howing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity"; (2) "showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision"; or (3) "showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." Ulrich, 308 F.3d at 984–85 (quotation marks and citations omitted). In most circumstances, municipal liability "may not be

predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).

Typically, the question of whether a policy or custom exists is a jury question. Id. at 920. But summary judgment is appropriate where, as is the case here, the evidence falls short of establishing a "persistent and widespread practice such that it constitutes "permanent and well settled" city policy. Id. at 919. Swanberg asks the Court to infer a custom at the City of Canby of retaliating against whistleblowers from "widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." Pl. Memo. at 24 (quoting Hunter v. Cnty. of Sacramento, 652 F.3d 1225, 1233–34 (9th Cir. 2011). He asserts that "Britton, DiCenzo, and [Swanberg] engaged in conduct protected under the First Amendment and all three were forced to resign their employment over a period of [three] years." Pl. Memo. at 24. He claims that the City Manager and the City Council "knew of repeated instances of constitutional violations," that "errant municipal officials were not discharged or reprimanded," and that "City policies were not changed." Pl. Memo. at 24.

But Swanberg's proffered evidence that, in the last five years, two other former CPD employees filed a tort claim notice or lawsuit alleging wrongful constructive discharge is not sufficient to show that the City of Canby had a pervasive practice of retaliating against whistleblowers of such a duration that it could be considered "standard operating procedure." Hunter, 652 F.3d at 1233. By contrast, for example, the plaintiff in Hunter produced testimony from a corrections officer that there were "40 to 50 'major incidents' of excessive force" that jail officials failed to investigate and for which the officers involved were never disciplined. Id. at

1227. Swanberg's evidence shows "isolated" or "sporadic" problems, not a pervasive and widespread practice from which the Court can infer a "custom." See id. at 1233.

Similarly, the plaintiff in Blair produced evidence that, after he reported criminal activity in the City of Pomona Police Department's Major Crimes Task Force, his fellow officers subjected him to five months of withering harassment, including

> insults written on his locker; spittle spat on his locker; the wiring shut of his locker; the theft of his equipment; the cutting off of his radio communication; the trashing of his uniforms; the dumping of drinks in his unit car; the backturning of fellow officers; the tolerated denial of backup; the insults offered by officers to his mother, wife, and children; the blocking of his mother's car; his removal as head of STOP and transfer to a position subordinate to an officer who didn't want him; the telephoning of a threat of bodily injury to him and of death to his family; and the failure to provide a guard for him after the threat.

Blair v. City of Pomona, 223 F.3d 1074, 1076, 1079. A reasonable fact finder could have inferred, the Blair court explained, that the acts were done with "the knowledge and tacit connivance of those running the Department." Id. at 1080. The plaintiff had, therefore, produced evidence that a reasonable juror could rely on to conclude the department had a custom of "chastising whistleblowers" and had "failed to train its members not to retaliate against whistleblowers." Id.

The only evidence that could be construed as suggesting he was harassed is Swanberg's testimony that some CPD officers and management referred to him, Britton, and DiCenzo as "the Three Amigos." Swanberg Depo., ECF No. 43-5 at 61–62. That is insufficient to show a "custom" of harassing whistleblowers or that the municipality failed to take action to curb abusive retaliatory behaviors.

Swanberg's alternative bases for finding Monell liability, that Chief Smith was a final decision-maker regarding employment policies for the City of Canby, or that the municipality

OPINION & ORDER - 23

delegated that authority to him, also fail. Whether an official is a policymaker for <u>Monell</u>

purposes is a question governed by state law. <u>Ellins v. City of Sierra Madre</u>, 710 F.3d 1049,

1066–67 (9th Cir. 2013) (citing <u>Praprotnik</u>, 485 U.S. at 124). "It is a purely legal question which

should be decided by the trial judge before the case goes to the jury." <u>Los Angeles Police</u>

<u>Protective League v. Gates</u>, 907 F.2d 879, 889 (9th Cir. 1990) (citing <u>Jett v. Dallas Indep. School</u>

<u>Dist.</u>, 491 U.S. 701 (1989)).

The City Administrator, not Chief Smith, is the final policy maker on employment issues

for the City of Canby. The Code grants to the City Administrator the power and duty to

> [h]ire or remove all City employees and have general supervision and control over
> them and their work, with power to transfer an employee from one department to
> another. The Administrator shall supervise the departments to the end of obtaining
> the utmost efficiency in each of them. He shall have the power to suspend an
> appointed City Officer pending review and final action of the Council.

Meneghello Decl., Ex. 30, ECF No. 40-30 at 1. Even assuming Chief Smith was the "ultimate

decision maker" on Swanberg's proposed termination, that is not sufficient to show that he is a

policy maker for the purposes of <u>Monell</u> liability. <u>See</u> <u>Ulrich</u>, 308 F.3d at 985 (relying on

language from city Charter to conclude that the hospital medical director was not a final policy-

maker on employment issues, despite her discretion to make decision affecting the plaintiff's

employment rights); <u>Gillette</u>, 979 F.2d at 1350 (explaining that the "discretionary authority to

hire and fire employees . . . is not sufficient to establish a basis for municipal liability.").

Nor is there sufficient evidence that the City has delegated to Chief Smith the power to

set employment policy within the CPD. Swanberg offered evidence that Smith issues General

Orders ("GO") which set standards for performance and conduct within the CPD. Ellis Decl.

Exs. 17–19, ECF Nos. 43-17–43-19. Smith testified that he has authority to approve the GOs,

and the GOs are not circulated to the City Manager or City Council for approval. Smith Depo.,

ECF No. 43-7, at 3. But Smith also testified that he has hiring and firing authority "in coordination with the City Administrator." Smith Depo., ECF No. 43-7, at 4. For the City to be liable under this branch of <u>Monell</u> liability, the acting officer must have "final" policymaking power, or the plaintiff must produce evidence that the municipality "ratified" the acting officer's decision. <u>See Ulrich</u>, 308 F.3d at 986. Swanberg's evidence shows that Chief Smith has great latitude in exercising his discretion in employment matters within the CPD, but also that his decisions are made "in coordination" with an official who has power over him. That is not sufficient to establish municipal liability under <u>Monell</u>.

### 4. Equal Protection Retaliation

Finally, Defendants assert that they are entitled to summary judgment against Swanberg's Equal Protection retaliation claim because "Section 1983 retaliation claims based on Equal Protection are prohibited by law." Def. Mot. at 32 (citing <u>Sizemore v. City of Dallas</u>, 443 F. Supp. 2d 1201, 1204 (D. Or. 2006)). Swanberg insists that such a claim is available to him because, although he is not a member of protected class, he was retaliated against because he assisted Officer Britton's gender discrimination claim. Pl. Memo. at 21–22 (citing <u>RK Ventures, Inc. v. City of Seattle</u>, 307 F.3d 1045, 1055–56 (9th Cir. 2002)).

Assuming without deciding that Swanberg can bring an Equal Protection retaliation claim, he has failed to produce sufficient evidence to survive summary judgment. To find an equal protection violation, a jury must "find that the individual defendants retaliated against [Swanberg] *because* he offered assistance to a" member of a protected class. <u>Maynard v. City of San Jose</u>, 37 F.3d 1396, 1404 (9th Cir. 1994), <u>as amended</u> (Nov. 22, 1994). The only evidence in the record about Defendants' attitude toward Swanberg because of his participation in the Britton matter is that certain employees at CPD, including Lieutenant Tro, referred to Swanberg, Britton,

and DiCenzo as the "Three Amigos." Swanberg Depo., ECF No. 43-5 at 61–62. That is not sufficient evidence to show that internal investigation into Swanberg was in retaliation for his involvement in the Britton matter. Tro's testimony, as detailed above, was that he harbored hurt feelings toward Swanberg's stemming from Swanberg's own lawsuit and the allegation that Tro had promised but failed to deliver a promotion. In other words, the evidence suggests Tro could have retaliated against Swanberg for his speech, not with whom he was associating.

Swanberg attempts to show causation by pointing to testimony from Tro that he was "shocked" that BOLI investigators found Tro's testimony regarding Officer Britton was not credible. Pl. Memo. at 7. However, the cited evidence is not included in the exhibits submitted to the Court, and even if it were, Tro's reaction does not at all suggest that he retaliated against Swanberg because of his involvement in the BOLI investigation. Therefore, Defendants' motion for summary judgment against Swanberg's Equal Protection claim is granted.

## ORDER

For the reasons stated, Defendants' motion for summary judgment [39] is GRANTED in part and DENIED in part.

Dated this _____9_____ day of _____Sept._____, 2015.

_____
MARCO A. HERNÁNDEZ
United States District Judge

OPINION & ORDER - 26